**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **ALMA DELIA DELGADO-**<br>**RAMIREZ,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **EP-11-CV-009-KC** |
| | § | |
| **DANIEL LOPEZ and MARIA** | § | |
| **DELOSANGELES LOPEZ,** | § | |
| | § | |
| **Defendants**. | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Alma Delia Delgado-Ramirez ("Delgado-Ramirez") brings the above-captioned

civil action against Defendants Daniel Lopez ("Lopez") and Maria Delosangeles Lopez asserting

that Defendants wrongfully removed or retained a child, D.L.A., in violation the Hague

Convention on the Civil Aspects of International Child Abduction ("Hague Convention"),

October 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89.  On February 16, 2011, the matter was

tried before the Court.  Having reviewed the evidence on the record, the Court makes the

following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of

Civil Procedure.[1]

I.      **FINDINGS OF FACT**

The Court finds the following facts:

1.      D.L.A. is the child of Delia Alejandra Avila ("Alejandra Avila") and Daniel Lopez

("Lopez"), and was born in El Paso, Texas.

---

[1]      To the extent that any finding of fact is more aptly characterized as a conclusion of law,
or any conclusion of law is more aptly characterized as a finding of fact, the Court adopts
it as such.

2.     Within 15 days of D.L.A.'s birth, Alejandra Avila and Lopez took D.L.A. and moved in

with Delgado-Ramirez at Delgado-Ramirez's home in Ciudad Juarez, Mexico.  After

Delgado-Ramirez obtained a promotion to the position of federal judge in 2006 that

required her to move to Chihuahua, Mexico, D.L.A. resided with her there.

3.     At some point Alejandra Avila and Lopez separated, and Lopez returned to live in the

United States, where he currently works at a call center.  D.L.A. continued to reside in

Mexico.

4.     On February 24, 2009, the Fifth Family Court of the District of Morelos, in the State of

Chihuahua, Mexico ("Fifth Family Court"), awarded custody of D.L.A. to Delgado-

Ramirez.  Delgado-Ramirez had petitioned for custody on the grounds that Alejandra

Avila was not properly caring for D.L.A.  Lopez cooperated with Delgado-Ramirez in

her petition for custody.

5.     After Delgado-Ramirez obtained custody, Lopez continued to visit with the child

between two and six times per year.

6.     Later, Delgado-Ramirez and Alejandra Avila reconciled to some degree, and Delgado-

Ramirez curtailed Lopez's visits.  Lopez was not able to visit with D.L.A. at all between

December 24, 2009, and September 4, 2010.

7.     Because he was being denied voluntary visitations, on July 8, 2010, Lopez requested the

Fifth Family Court grant him visitation rights, which the Fifth Family Court did on July

15, 2010.  The Fifth Family Court decreed that Lopez was entitled to visit with D.L.A.

every other week on Saturdays and Sundays, between 10:00 a.m. and 8:00 p.m.  This

decree required Lopez to pick up and drop off D.L.A. from Delgado-Ramirez's home in

Chihuahua, Mexico.  The decree warned Delgado-Ramirez that if she failed to allow

Lopez to visit with D.L.A., the custody granted to her would be revoked.

8. On August 4, 2010, Delgado-Ramirez filed a request to have Lopez's visits with D.L.A.

be supervised visits.  Among other reasons she cited, Delgado-Ramirez alleged that

Lopez and his mother had threatened to take D.L.A. to the United States and never return

her.  Delgado-Ramirez also alleged that Lopez and Lopez's mother had applied for a

United States passport in D.L.A.'s name for this purpose.  Delgado-Ramirez's request for

supervised visits was never ruled upon.

9. Despite the Fifth Family Court's July 15, 2010, order no visits between Lopez and

D.L.A. occurred.  As a result, on August 12, 2010, Lopez filed a petition for custody over

D.L.A. and to have Delgado-Ramirez's custody revoked.

10. In late August 2010, Delgado-Ramirez was living at her residence in Ciudad Juarez, and

had enrolled D.L.A. in school there, as Delgado-Ramirez intended to reside there for the

rest of 2010.  However, by agreement between Delgado-Ramirez and Alejandra Avila,

D.L.A. was then living at Alejandra Avila's home in Ciudad Juarez.

11. On August 29 or 30, 2010, after Delgado-Ramirez had avoided meeting or speaking with

Lopez and his mother since the July 15, 2010, decree was issued, the latter managed to

confront Delgado-Ramirez at her home in Ciudad Juarez.  At that meeting, Delgado-

Ramirez agreed to abide by the Court decree and make D.L.A. available to Lopez for a

visit on September 4, 2010.  Delgado-Ramirez and Lopez agreed that Lopez could take

D.L.A. to El Paso, Texas for the visit, due to the violent conditions prevailing in Ciudad

Juarez.

12.     On September 4, 2010, Lopez picked up D.L.A. from Delgado-Ramirez in Ciudad

Juarez, but did not return her to Delgado-Ramirez at 8:00 p.m. as he had agreed to, and as

required by the Fifth Family Court's order.  D.L.A. has since continuously resided with

Lopez in El Paso.

13.     After Lopez failed to return D.L.A. to her residence in Ciudad Juarez, Delgado-Ramirez

left voice messages for Lopez on his phone and knocked on Lopez's door in El Paso,

trying unsuccessfully to find D.L.A.  Delgado-Ramirez then returned to Mexico and filed

a police report alleging that D.L.A. had been abducted by Lopez.

14.     On September 6, 2010, the Fourth Family Court, of the District of Morelos, in the State

of Chihuahua, Mexico ("Fourth Family Court"), issued an order granting Lopez custody

over D.L.A. and revoking Delgado-Ramirez's custody.  The only reasons cited by the

Fourth Family Court was the fact that D.L.A. was living with Alejandra Avila, and that it

would be in D.L.A.'s best interest to be placed in Lopez's custody.

15.     Delgado-Ramirez appealed this order and also requested the Fourth Family Court judge

to recuse himself.  The Fourth Family Court judge did so on October 8, 2010, and

transferred the case to the Fifth Family Court.

16.     On December 9, 2010, the Fifth Courtroom on Civil Matters in the State Supreme Court

of Justice reversed the Fourth Family Court's grant of custody to Lopez, and restored

Delgado-Ramirez's custody rights.  The State Supreme Court explained that the mere

fact that D.L.A. was residing with Alejandra Avila was not a sufficient basis for revoking

the custody that had been granted to Delgado-Ramirez.

17.     Delgado-Ramirez filed the instant action on January 7, 2011, seeking the return of D.L.A.

to Delgado-Ramirez under the Hague Convention, as implemented in the United States

by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11611.

## II.   CONCLUSIONS OF LAW

In light of the foregoing findings, the Court makes the following conclusions of law.

### A.   Standard

In 1988, the United States Senate ratified the Hague Convention, and it entered into force on July 1, 1988.  Hague Conv.  The objectives of the Hague Convention are "to secure the prompt return of children wrongfully removed to or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."  Hague Conv., art. 1.  ICARA establishes procedures for the implementation of the Hague Convention in the United States, but ICARA's provisions "are in addition to and not in lieu of the provisions of the Hague Convention."  42 U.S.C. § 11601(b)(2).

Under ICARA, anyone seeking the return of a child allegedly wrongfully removed to or retained in the United States may invoke the provisions of the Hague Convention by commencing a civil action in any state or federal court in the United States that has jurisdiction over the place where the child is located when the action is filed.  *Id.* § 11603(a)-(b).  Once an action is filed, the "court in which an action is brought . . . shall decide the case in accordance with the [Hague] Convention."  *Id.* § 11603(d).  Though the Hague Conventionis silent with regard to burdens and standards of proof, ICARA states that the petitioner seeking the return of the child has the burden of proving by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention."  *Id.* § 11603(e)(1)(A). The respondent in any such action has the burden of proving that one of the affirmative defenses

5

listed in articles 12, 13, or 20 applies.  *Id.* § 11603(e)(2).  The standard of proof for these

affirmative defenses is either preponderance of the evidence or clear and convincing evidence.

*Id.* § 11603(e)(2)(A)-(B).

    **B.**    **Analysis**

    The parties do not dispute that the Hague Convention applies to this matter, as D.L.A. is

less than sixteen years old and both Mexico and the United States are Contracting Parties to the

Hague Convention.  *See* Hague Conv., art. 4; Hon. James D. Garbolino, *International Child*

*Custody: Handling Hague Convention Cases in U.S. Courts* 251-252 (3d ed. 2000) (detailing

when Hague Convention entered into force between the United States and Mexico).  Under the

Hague Convention, a wrongful removal or retention occurs when someone "removes or retains

the child outside the child's country of habitual residence, and this removal: breaches the rights

of custody accorded to the other parent under the laws of that country; and, at the time of

removal, the non-removing parent was exercising those custody rights."  *Sealed Appellant v.*

*Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004) (citing Hague Conv., art. 3).

    Rights of custody may arise from operation of law, from a judicial or administrative

decision, or from a legally binding agreement.  Hague Conv., art. 3.  Rights of custody are

defined as "rights relating to the care of the person of the child and, in particular, the right to

determine the child's place of residence."  Hague Conv., art. 5(a).  ICARA requires proof of

exercise of custody rights by a preponderance of the evidence, but under the Hague Convention a

petitioner with rights of custody receives a presumption that he or she is exercising those rights.

Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg.

10,494, 10,507 (Mar. 26, 1986) ("Text and Legal Analysis") ("In the scheme of the Convention

it is presumed that the person who has custody actually exercised it."); Elisa Perez-Vera,

*Explanatory Report: Hague Convention on Private International Law*, ¶ 73, *in* 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426, 449 ("the Convention, taken as a whole, is built upon the tacit presumption that the person who has care of the child actually exercises custody over it.  This idea has to be overcome by discharging the burden of proof which has shifted, as is normal with any presumption").[2]  So, the burden of proof on the petitioner for this element is very slight; all that is necessary is "some preliminary evidence."  Perez-Vera, ¶¶ 67-68.

As relevant here, even if there was a wrongful removal or retention, a court may not order a child returned if the respondent proves by a preponderance of the evidence that "the non-removing party was *not* exercising custody rights at the time of the child's removal."  *Sealed Appellant*, 394 F.3d at 343 (emphasis in original).  This defense, like all of the other Hague Convention's affirmative defenses, is to be construed "narrow[ly]."  *Id.*  "[I]n the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes "exercise" of those rights."  *Id.* at 345.  Someone with custody "cannot fail to 'exercise' those custody rights under the Hague Convention *short of acts that constitute clear and unequivocal abandonment of the child*."  *Id.* (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)) (emphasis in *Sealed Appellant*).

---

[2]     *See Sealed Appellant*, 394 F.3d at 343 ("The Explanatory Report is recognized as the official history, commentary, and source of background on the meaning of the provisions of the [Hague] Convention."); *see also Zicherman v. Korean Air Lines Co., Ltd.*, 516 U.S. 217, 226 (1996) ("Because a treaty ratified by the United States is not only the law of this land . . . but also an agreement among sovereign powers, we have traditionally considered as aids to its interpretation the negotiating and drafting history (travaux preparatoires) and the postratification understanding of the contracting parties.").

If a wrongful removal or retention has been established and no affirmative defenses have been proven to apply, the court "shall order the return of the child forthwith."  Hague Conv., art. 12.

Here, the evidence shows that there was a wrongful retention of D.L.A. in the United States.  The parties do not dispute that prior to September 4, 2010, D.L.A. lived in Mexico for essentially her entire life, so Mexico is unequivocally D.L.A.'s habitual residence.  On September 4, 2010, the February, 24, 2009, court order granting Delgado-Ramirez custody rights over D.L.A. was still in effect.  While Delgado-Ramirez freely allowed Lopez to take D.L.A. to the United States for the visit, so that the removal from Mexico was not wrongful, Lopez did not return D.L.A. to Delgado-Ramirez at the time specified in the court order giving Lopez visitation rights, namely, 8:00 p.m.  Therefore, the retention was wrongful.  Delgado-Ramirez had not consented to a longer time; when Lopez took D.L.A., Delgado-Ramirez and Lopez confirmed that D.L.A. was to be returned at 8:00 p.m. the same day.  Some courts have held that a retention is not wrongful until the person with custody takes some affirmative action to assert his or her rights to custody.  *See Slagenweit v. Slagenweit*, 841 F. Supp. 264, 270 (N.D. Ohio 1993).  Though this does not seem necessary here, where, according to the parties' agreement and the Fifth Family Court's order, Lopez's temporary right of possession of D.L.A. was supposed to automatically expire at 8:00 p.m., the Court finds in any event that Delgado-Ramirez's phone calls, visit to Lopez's home, and filing of a police report suffice to establish such an assertion.  Therefore, when Lopez did not return D.L.A. by 8:00 p.m., he wrongfully retained her in the United States, in violation of Delgado-Ramirez's custody rights.

The issue upon which this case turns is the second element of wrongful retention, whether Delgado-Ramirez was actually exercising her custody rights.  The evidence supporting a

8

finding of actual exercise in late August 2010, around the time D.L.A. was removed, is: Delgado-Ramirez had registered D.L.A. for school in Ciudad Juarez; was paying for that school and other expenses related to D.L.A.'s care; was exercising her authority over D.L.A.'s living arrangements by allowing D.L.A. to live with the mother, with ongoing monitoring to ensure that D.L.A. was receiving adequate care; and was the person with authority to determine when Lopez's visits would take place.  The evidence tending to indicate that Delgado-Ramirez was not exercising her custody rights over D.L.A. was that D.L.A. was living with Alejandra Avila, and that the Fourth Family Court found this was enough to warrant revoking Delgado-Ramirez's custody rights on September 6, 2010.

The Fifth Circuit's rule is that in the absence of a ruling from a court in the country the child was removed from, proof of a failure to exercise custodial rights requires proof of "'acts that constitute clear and unequivocal abandonment of the child.'" *Sealed Appellant*, 394 F.3d at 345 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)) (emphasis in *Sealed Appellant*).  Given that there are no facts showing clear and unequivocal abandonment, the question here is what to make of the September 6, 2010 decree revoking Delgado-Ramirez's custody rights.  On the one hand, the decree had not yet taken effect when Lopez wrongfully retained D.L.A. from Delgado-Ramirez's custody on September 4, 2010, so it is not a binding determination of custody rights or whether Delgado-Ramirez was exercising them.  On the other hand, the decree was entered not even two full days after the wrongful retention, so the factual predicate for it must necessarily have been the circumstances in existence at the time leading up to and including the date of wrongful retention.  Thus, this situation may fall in the exception to the general rule requiring proof of clear and unequivocal abandonment – here, there is the

presence of a ruling from the court in the country from which the child was removed, so that should decide the matter.

However, the Court holds otherwise, for three reasons.  First, after examining the case law that gave rise to the Fifth Circuit's pronouncement, the Court does not believe that the September 6, 2010, decree is the type of ruling envisioned in *Sealed Appellant*.  The phrase "absence of a ruling from a court in the child's country of habitual residence" was first used in the seminal Sixth Circuit opinion cited by the Fifth Circuit, *Friedrich v. Friedrich*, 78 F.3d at 1066.  And in *Friedrich*, the Sixth Circuit used the phrase in the middle of a discussion of how to define "exercise" in the context of custodial rights.  After laying out a possible common law-style approach to defining the term using several judicially enumerated factors, the Sixth Circuit backed away, and instead decided in favor of a much more expansive definition:

> Enforcement of the Convention should not to be made dependent on the creation of a common law definition of "exercise." The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find "exercise" whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.

*Friedrich*, 78 F.3d at 1066.

Thus, the type of ruling envisioned by the Sixth Circuit was not a specific pronouncement of whether the particular party before the court was exercising custody rights, but instead a ruling giving a definition of what it means under the law of the given country to exercise custody rights.  In other words, in the present circumstances, the Court should look not for a determination from a Mexican court of whether Delgado-Ramirez was exercising custodial rights, but rather for a Mexican court ruling that gives the standard for what it means in general to exercise custodial rights.

10

While this distinction might seem almost evanescent, the Court nonetheless believes that this is what the Sixth Circuit, and thus the Fifth Circuit, meant, because the alternative would read a provision out of the Hague Convention entirely.  Any set of circumstances showing a person's abandonment of custodial rights would also justify a revocation of those rights.  That is, it would be odd indeed for a court to find a person to be not exercising custodial rights, but nonetheless affirm the grant of custody rights to that person; a court ruling on a party's entitlement to continuing custodial rights seems to necessarily incorporate a determination of whether the party has been previously exercising those rights.  In light of this, if the relevant ruling referred to in *Sealed Appellant* and *Friedrich* were a determination of whether a given parent was exercising custody rights, an examination of the second criterion of article 3, actual exercise of rights, would in all likelihood always return the same answer as an examination of the first criterion, whether a person had rights at all.  The unusual circumstances currently before the Court present the only realistic scenario in which this could occur, and even here, the scenario fails for two additional reasons, as specified below.  The Court presumes that the Fifth and Sixth Circuits did not craft a definition of exercise that would render statutory language a nullity.  *See Crist v. Crist*, 632 F.2d 1226, 1233 n.11 (5th Cir. 1980) (courts must "give effect, whenever possible to all parts of a statute and avoid an interpretation which makes a part redundant or superfluous").  So, the Court instead interprets "ruling of the child's country of habitual residence" to refer to a broadly applicable decision defining the term "exercise," rather than a reference to a decree specifically applicable in a case before a court.  And so read, the September 6, 2010, decree does not qualify as a ruling of the country of habitual residence, so it does not control here.

11

A second reason why the Court does not accord the September 6, 2010, order dispositive weight is that the order does not actually state that Delgado-Ramirez was failing to exercise her custodial rights. The decree simply states that D.L.A. was living with the mother, and that after considering the best interests of the child, the court decided that Delgado-Ramirez's custody rights should be revoked.  This could imply that Delgado-Ramirez was failing to exercise her custodial rights by allowing D.L.A. to live with Alejandra Avila.  But the more plausible interpretation of this decree, taking into account all of the order's language, is that the Fourth Family Court found that Delgado-Ramirez was exercising her rights but exercising them poorly and not in the best interests of the child.  Though this would tend to indicate that D.L.A. would not be best served by being returned to Delgado-Ramirez, that is a determination of the merits of the underlying custody dispute, which is forbidden territory under the Hague Convention for any courts outside the country of habitual residence.  *See Sealed Appellant*, 394 F.3d at 344 (citing *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995)).  So, it is enough for present purposes that the September 6, 2010, decree was not a ruling of non-exercise of rights; because this is clear, the September 6, 2010 decree is irrelevant.

Finally, the September 6, 2010, decree was not the final pronouncement of the courts of Mexico on the issue.  After the child had been removed, the September 6, 2010, ruling was overturned by a Mexican appellate court.  Whatever evidentiary weight the September 6, 2010, decree had is therefore considerably compromised; the latest ruling from the Mexican courts is that Delgado-Ramirez was in fact exercising her rights and exercising them in D.L.A.'s best interests.  For these reasons, the September 6, 2010, decree is not binding upon this Court, but instead stands as, at most, some evidence that Delgado-Ramirez was not exercising her custodial rights.

Viewing the evidence as a whole, Lopez has not carried his burden of proving by a preponderance of the evidence that Delgado-Ramirez was no longer exercising her custodial rights.  Though D.L.A. was living with Alexandra Avila, this appears to be the result of an exercise of custodial rights, not a derogation of them.  Delgado-Ramirez was living in the same city as D.L.A. and Alejandra Avila, was continuing to pay for D.L.A.'s care, and intended to continue to monitor the care D.L.A. was receiving.   Additionally, and significantly, Lopez did not negotiate with Alejandra Avila for a visit with D.L.A., but with Delgado-Ramirez.  Delgado-Ramirez evidently continued to be the ultimate authority over D.L.A., which is a strong indication that she was continuing to exercise her custody rights.  *See* Text and Legal Analysis, 51 Fed. Reg. at 10,507 ("if a child is abducted from the physical custody of the person in whose care the child has been entrusted by the custodial parent who was 'actually exercising' custody, it is the parent who placed the child who may make application under the Convention for the child's return.").  Under these circumstances, the preponderance of the evidence indicates that Delgado-Ramirez was continuing to exercise her custodial rights.

Accordingly, Delgado-Ramirez has established the elements of wrongful retention: Lopez continued to hold D.L.A. after his lawful visitation period, in violation of Delgado-Ramirez's custodial rights which Delgado-Ramirez was continuing to exercise.  Lopez has not proven by a preponderance of the evidence that Delgado-Ramirez had clearly and unequivocally abandoned D.L.A.  Lopez having wrongfully retained D.L.A. less than one year prior to the commencement of these proceedings, D.L.A. must be returned to Delgado-Ramirez forthwith. *See* Hague Conv., art. 12.

**C.     Costs and Fees**

The sole remaining issue before the Court is Delgado-Ramirez's request for costs and fees incurred in securing the return of D.L.A.  The Hague Convention allows and ICARA requires that when a petitioner prevails and a court orders a child returned, that court "shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees . . . , and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate."  42 U.S.C. § 11607(b)(3); Hague Conv., art. 26.

Lopez has conceded that he took D.LA. wrongfully, by deceiving Delgado-Ramirez. However, Delgado-Ramirez has admitted that in late 2009 she curtailed the voluntary visitation privileges she had accorded Lopez in the earlier years of D.L.A.'s life.  Delgado-Ramirez has also conceded facts indicating that in the months leading up to Lopez's first visit on September 4, 2010, Delgado-Ramirez was in violation of the Fifth Family Court's order allowing Lopez visitation rights.  Lopez was not able to see his daughter at all between Christmas Eve 2009 and September 4, 2010.  While Delgado-Ramirez's fears that D.L.A. would be taken to the United States and not returned appear prescient in retrospect, the Court questions whether this abduction would have occurred had Delgado-Ramirez been more liberal with voluntary visitation, and had Delgado-Ramirez promptly complied with the Fifth Family Court's order requiring her to accommodate Lopez's visitation rights.  This does not excuse Lopez for ill-advisedly exercising self-help remedies, but the Court recognizes that neither party in this action is blameless.

Additionally, Lopez testified that he took D.L.A. after having been notified by his attorney that a court decree would soon be issued granting him custody.  Two days after he wrongfully retained D.L.A., the Fourth Family Court did issue such a decree.  Finally, Lopez stated that he has only kept D.L.A. after December 2010, when the State Supreme Court restored

Delgado-Ramirez's custody rights, because he was informed by his attorney in Mexico that enforcement of the order restoring custody would be stayed pending the outcome of further proceedings in Mexico. Whether this was a correct interpretation of Mexican law or not the Court does not decide, but the Court does take notice of the fact that Lopez had some legal basis for his continued retention of D.L.A., and does not appear to have been in complete disregard of the law since September 4, 2010.

In light of this behavior on each side, the Court finds that both parties here have unclean hands. This, combined with the relative economic positions of both parties, indicates that an award of fees and costs to Delgado-Ramirez is clearly inappropriate. *See Rydder v. Rydder*, 49 F.3d 369, 373-74 (8th Cir. 1995) (taking into account party's economic situation when considering amount of fees); *Vasquez v. Colores*, Civil No. 10-3669, 2010 WL 3717298, at *10 (D. Minn. Sept. 14, 2010) (finding fees inappropriate based only on respondent's economic situation); *Poliero v. Centenaro*, No. 09-CV-2682 (RRM)(CLP), 2009 WL 2947193, at *22 (E.D.N.Y. Sept. 11, 2009) (same); *see also Whallon v. Lynn*, No. Civ.A. 00-11009-RWZ, 2003 WL 1906174, at *4 (D. Mass. April 18, 2003) (reducing an award in part "because both parties bear responsibility for the degree of enmity between them"). Delgado-Ramirez's request for costs and fees is denied. Each side shall bear its own fees and costs.

## III.    CONCLUSION

For the reasons set forth above, the Court hereby **GRANTS** the Petition for Return of a Child Victim of International Abduction, ECF No. 1.

Petitioner Alma Delia Delgado-Ramirez is hereby **AWARDED** physical custody of D.L.A. for the purpose of returning D.L.A. to her country of habitual residence, Mexico.

15

Respondents Daniel Lopez and Maria Delosangeles Lopez **SHALL SURRENDER** D.L.A. to Petitioner forthwith.

Petitioner's request for attorney's fees and costs is **DENIED**.

**SO ORDERED.**

**SIGNED** on this 17th day of February, 2011.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE